# United States Court of Appeals
## For the First Circuit

Nos. 10-1418, 10-1419, 10-1465, 10-1466,
    10-2368, 10-2369, 11-2254, 11-2256

JOHN E. DAVIS, Administrator of the Estate of Debra Davis; ROBERT
   P. DAVIS, Administrator of the Estate of Debra Davis; MARION
   HUSSEY, in her capacity as Administratrix of the Estate of
                      Deborah Hussey,

         Plaintiffs, Appellees/Cross-Appellants,

                         v.

               UNITED STATES OF AMERICA,

         Defendant, Appellant/Cross-Appellee.

                   _____

JOHN J. CONNOLLY; JOHN M. MORRIS; LAWRENCE SARHATT; H. PAUL RICO;
     ROBERT FITZPATRICK; JAMES RING; RODERICK KENNEDY; JAMES
GREENLEAF; JAMES AHEARN; JAMES BULGER; STEPHEN FLEMMI; JOHN DOES
                         1-50,

                      Defendants.

              _____

      APPEALS FROM THE UNITED STATES DISTRICT COURT

          FOR THE DISTRICT OF MASSACHUSETTS

      [Hon. William G. Young, U.S. District Judge]

                   _____

                      Before
           Boudin, Howard and Thompson,
                 Circuit Judges.

              _____

       Thomas M. Bondy, Appellate Staff, Civil Division,
Department of Justice, with whom Tony West, Assistant Attorney
General, and Jonathan H. Levy, Appellate Staff, Civil Division,
Department   of   Justice,   were   on   brief   for   defendant,
appellant/cross-appellee.
       Ann M. Donovan with whom Law Office of Ann M. Donovan was on
brief for plaintiff-appellee/cross appellant Marion Hussey, in her

capacity as Administratrix of the Estate of Deborah Hussey.

Michael J. Heineman with whom Paul J. Griffin and Mingace & Heineman were on brief for plaintiffs-appellees/cross-appellants John E. Davis and Robert P. Davis, Administrators of the Estate of Debra Davis.

---

January 20, 2012

---

**BOUDIN, <u>Circuit Judge</u>**.  The United States appeals from a judgment awarding damages to the families and estates of two women, Deborah Hussey and Debra Davis, killed by James Bulger and Stephen Flemmi in the 1980s.  <u>Litif</u> v. <u>United States</u>, 682 F. Supp. 2d 60 (D. Mass. 2010).  It also appeals from an award of $10,000 in attorney fees in the Davis case as sanctions against the United States.  <u>Davis</u> v. <u>United States</u>, 739 F. Supp. 2d 64 (D. Mass. 2010).  The families and estates of the murder victims cross-appeal, seeking an increase in damages for the victims' pain and suffering.

This appeal is one of a number of cases in this circuit in which families of victims murdered by members of a Boston organized crime gang have brought suit under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)(1), 2401(b), 2671 <u>et seq</u>.[1]  The suits have aimed to impose liability on the United States for the actions of Federal Bureau of Investigation ("FBI") agents for protecting gang members who were also FBI informants.

---

[1] <u>Donahue</u> v. <u>United States</u>, 634 F.3d 615 (1st Cir. 2011); <u>Limone</u> v. <u>United States</u>, 579 F.3d 79 (1st Cir. 2009); <u>McIntyre</u> v. <u>United States</u>, 545 F.3d 27 (1st Cir. 2008); <u>Barrett</u> v. <u>United States</u>, 462 F.3d 28 (1st Cir. 2006), <u>cert. denied</u>, 550 U.S. 936 (2007); <u>Patterson</u> v. <u>United States</u>, 451 F.3d 268 (1st Cir. 2006); <u>Rakes</u> v. <u>United States</u>, 442 F.3d 7 (1st Cir. 2006); <u>Callahan</u> v. <u>United States</u>, 426 F.3d 444 (1st Cir. 2005); <u>McIntyre</u> v. <u>United States</u>, 367 F.3d 38 (1st Cir. 2004).  <u>See also</u> <u>United States</u> v. <u>Connolly</u>, 504 F.3d 206 (1st Cir. 2007); <u>United States</u> v. <u>Connolly</u>, 341 F.3d 16 (1st Cir. 2003), <u>cert. denied</u>, 552 U.S. 1260 (2008); <u>United States</u> v. <u>Flemmi</u>, 225 F.3d 78 (1st Cir. 2000), <u>cert. denied</u>, 531 U.S. 1170 (2001).

-3-

Unlike a number of such suits, the timeliness of the Hussey and Davis claims is not disputed.

The claims stem from the murders--in 1981 and 1984 or 1985, respectively--of Debra Davis ("Davis"), Flemmi's girlfriend, and Deborah Hussey ("Hussey"), the daughter of Marion Hussey (with whom Flemmi had a relationship and lived for some years). Both Davis and Hussey, then in their mid-20s, were murdered in the same fashion: on separate occasions Bulger and Flemmi lured each one into a house and then strangled her. The district judge found that the motive for the murders was primarily domestic rather than to kill business associates of, or potential witnesses against, Flemmi and Bulger. Litif, 682 F. Supp. 2d at 71, 73.

The bodies of the women were not discovered until 2000, and Flemmi pled guilty to their murders in 2003. Litif, 682 F. Supp. 2d at 64. The Davis and Hussey families filed complaints in the district court against the United States under the FTCA in 2002 and 2003.[2] The gist of the claims, drawing upon Massachusetts tort law, was that the FBI had caused the women's deaths through their flagrant negligence in utilizing Flemmi and Bulger as informants, continuing to do so even after becoming aware of the pair's

---

[2] Davis' suit was brought by her mother, Olga Davis, in her capacity as the administratrix of her daughter's estate; Olga Davis having died in 2007, the new administrators of Debra Davis' estate now carry on this litigation. Hussey's suit was brought by her mother, Marion Hussey, who is the administratrix of Deborah Hussey's estate.

dangerousness, shielding them from prosecution, and "failing to control" them.

The cases were consolidated,[3] and they were tried by the district judge in a bench trial. At the conclusion, the district court found the government liable for negligence. It awarded the Davis estate $1 million for her mother's loss of consortium, the Davis and Hussey estates $350,000 each for pain and suffering resulting from their murders, and much smaller amounts for funeral expenses. Litif, 682 F. Supp. 2d at 85. Later, the court added sanctions against the government as described more fully below. Davis, 739 F. Supp. 2d at 69-70.

Certain of the findings of fact and chronology help to put the judgment in context:

> 1964: FBI agent Paul Rico opens Flemmi as an informant. Litif, 682 F. Supp. 2d at 68.
>
> 1969: Flemmi is indicted for the 1967 murder of Edward Bennett and attempted murder of John Fitzgerald. McIntyre, v. United States, 447 F. Supp. 2d 54, 78 (D. Mass. 2006). Rico tipped Flemmi off about the pending indictment and Flemmi was able to flee to Canada and escape further prosecution. When he tipped Flemmi off, Rico had intelligence information that Flemmi was guilty of the murder. Litif, 682 F. Supp. 2d at 68-69.
>
> 1971: Rico opens Bulger as an informant. Both Bulger and Flemmi were designated as top

---

[3]Davis and Hussey's claims were consolidated with each other and with that of Louis Litif's. Our separate opinion addressing Litif's suit is also released today, Litif v. United States, Nos. 10-1417, et al. (1st Cir.).

echelon informants, and were part of the FBI's overall priority at that time of prosecuting La Cosa Nostra, a rival organized crime group. Id. at 68.

1974: Flemmi returns to Boston after Rico told him it was safe to do so. Id. at 69. The murder and attempted murder charges were dismissed in November of 1974 due to unavailability of the principal witness.

1975: FBI agent John Connolly takes over as Bulger and Flemmi's handler. McIntyre, 447 F. Supp. 2d at 73-74.

1976: Connolly tells Bulger that Richard Castucci, a bookmaker, has been cooperating with the FBI. Castucci was murdered shortly thereafter and Flemmi and Bulger disposed of the body. McIntyre v. United States, 545 F.3d 27, 31 & n.5 (1st Cir. 2008). The FBI received information following the murder that Bulger was responsible. Litif, 682 F. Supp. 2d at 69.

1979: Connolly asks a federal prosecutor to remove Bulger and Flemmi from a race-fixing indictment; this request was a "substantial factor, if not the sole reason, that Bulger and Flemmi avoided indictment." Id. at 70. Connolly then asked Bulger and Flemmi to not murder the cooperating witness in that case. Id.

1980: Louis Litif, a former top echelon informant handled by Connolly and a bookmaker, is murdered by Bulger and an associate (a finding of fact disputed by the government in today's companion case, see note 3, above) after Connolly leaked Litif's recent offer to cooperate with law enforcement and to incriminate Bulger. Litif, 682 F. Supp. 2d at 70.

1980: State police decide to wiretap a garage frequently used by Bulger and his associates and Connolly leaks this information to Bulger. Id. at 71.

1981: Bulger and Flemmi murder Debra Davis, Flemmi's girlfriend of nearly ten years, by strangling her, because she "showed an inclination to get on with her life (without Flemmi) and had displayed an interest in another man." Id. at 71.

1983: In response to an inquiry from out-of-state law enforcement officers, Connolly writes a memo establishing a plausible alibi for Bulger for the murders of Roger Wheeler and John Callahan. Id. at 72. At least one of these alibis was pre-arranged in a phone call between Bulger and Connolly. McIntyre, 447 F. Supp. 2d at 82.

1984 or 1985: Flemmi and Bulger murder Deborah Hussey by strangling her because she had become an "inconvenience." Litif, 682 F. Supp. 2d at 73.

The FTCA is a limited waiver of the sovereign immunity that the United States otherwise enjoys, and it allows suits against the United States for money damages for

personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). Thus, the legal questions in this case--centering on principles of causation and damages--are primarily those of Massachusetts law.

On appeal, the government challenges both the district court's reading of Massachusetts case law on proximate cause (as well as its factual findings underlying but-for causation) and the

award of loss-of-consortium damages to Davis' deceased mother.  It also contests the sanctions against it.  The Davis and Hussey families have cross-appealed, seeking an increase in the respective $350,000 awards of damages for conscious pain and suffering.

Liability.  Massachusetts' Wrongful Death Act, Mass. Gen. Laws ch. 229, § 2 (2011), imposes liability, inter alia, on "[a] person who [] by his negligence causes the death of a person."  The statute largely incorporates common law tort principles. Matsuyama v. Birnbaum, 890 N.E.2d 819, 836-38 (Mass. 2008).  In addition to wrongfulness, it must be shown "that defendant's conduct was a but-for cause of [plaintiff's] injury . . . and that defendant's conduct was a 'substantial legal factor' in bringing about the alleged harm to the plaintiff." Jorgensen v. Mass. Port Auth., 905 F.2d 515, 524 (1st Cir. 1990).

Our review of FTCA bench trial awards is for clear error as to factual issues and de novo as to questions of law. Wojciechowicz v. United States, 582 F.3d 57, 66 (1st Cir. 2009). "The existence and extent of a duty of care are questions of law; whether any such duty has been breached and whether proximate cause exists are questions for the factfinder, whose determination is binding on appeal unless clearly erroneous."  Id. (internal quotation marks and citations omitted).  As it happens, proximate cause can also raise legal issues as well as factual ones; but-for causation is almost always a factual issue.

The district court found that the FBI's handling of Flemmi and Bulger was "negligent," Litif, 682 F. Supp. 2d at 76; but, as the facts demonstrate and the district judge's closing denunciation confirmed, id. at 86-89, it was negligence of a wildly reckless flavor. See also note 1, above. No detailed recitation is required here because the government makes no attempt to challenge the findings of wrongdoing by FBI handlers; its attack is on findings of "but for" and "proximate" causation.

The government first disputes but for causation, saying that proof is lacking that FBI negligence more likely than not led to the deaths of the two women. The district judge, by contrast, found that the FBI handlers kept Flemmi and Bulger in play and on the street, and deliberately interfered with attempts by prosecutors or other law enforcement entities and agents to arrest and prosecute Flemmi and Bulger. Litif, 682 F. Supp. 2d at 76. The chronology set forth above bears out these premises.

Yet the question remains whether any specific sequence of events--or a cumulation of them--makes it more likely than not, Enrich v. Windmere Corp., 616 N.E.2d 1081, 1084 (Mass. 1993), that the FBI's actions were causal steps leading to the women's deaths. After hearing Flemmi's testimony at the bench trial, the district court explicitly accepted the finding made by another district judge in a sentencing hearing for Flemmi:

> It is clear to me that Mr. Flemmi would have either been killed or in prison . . . if Paul

> Rico had not tipped him off and encouraged him to flee just before Mr. Flemmi was indicted for the bombing of John Fitzgerald and the murder of Walter Bennett. . . . [I]f Mr. Flemmi had been prosecuted in 1969 for the Fitzgerald bombing or the William Bennett murder, his role as an FBI informant might have been disclosed and examined more than 30 years ago. But Mr. Rico prevented that from happening.

Litif, 682 F. Supp. 2d at 68-69 (quoting United States v. Flemmi, 195 F. Supp. 2d 243, 247 (D. Mass. 2001)) (internal footnotes omitted).

Flemmi's co-defendant Francis Salemme was convicted of the bombing in 1973 and sentenced to a substantial term. United States v. Salemme, 91 F. Supp. 2d 141, 184 (D. Mass. 1999). The district judge concluded in substance that, but for Rico's tip and Flemmi's flight, Flemmi would likely have suffered the same fate and been in jail when the two women were later killed. Although Bulger as well as Flemmi participated in the actual murders, it was Flemmi who had the relationship with the women, had the clearer motive, and lured them into the houses where they were strangled.

The government says that Salemme's conviction does not show that Flemmi too would have been convicted. It points to an "important witness" who testified that Salemme had participated in the attempted murder and that his (the witness's) previous statements that Flemmi was involved were false. Salemme, 91 F. Supp. 2d at 184. Flemmi, it notes, agreed during his 2009 testimony with the statement that "Mr. Salemme had a much more

-10-

substantial role in the planning and execution" of the attempted murder than did Flemmi.  Overall, the government suggests that Flemmi, even if convicted, might have received a shorter sentence.

Yet the government indicted Flemmi and had evidence against him even if part of it later proved to be unreliable; Flemmi also admitted in his testimony at this trial that "he assisted in placing the bomb" in the murder attempt; and the government continued to assert his involvement when it prosecuted him in the 1990s.  <u>Salemme</u>, 91 F. Supp. 2d at 181-82. Reconstructing now just what evidence the government might have presented many years ago is difficult, but the district court's but-for finding is not clear error.

The but-for determination is reinforced by evidence of the other episodes described in the chronology above in which the FBI frustrated the capture and prosecution of Flemmi and Bulger. Even if each of the others is attended by more doubts as to consequences than Rico's original warning to flee, each adds something to the overall percentage chance that--but for the FBI misconduct--these murders would not have occurred.  That no one can assign exact probabilities is beside the point, and does not prevent an ultimate "more likely than not" finding.

The government also contests whether, even if the FBI's actions were a but-for cause of Davis and Hussey's murders, the government can be held liable for the murder of victims whom

the FBI could not, in the district court's words, have "particularly foreseen." Litif, 682 F. Supp. 2d at 76. Here, the primary question is whether the district court correctly discerned, and then properly applied, the proximate cause concept under Massachusetts law; the first is reviewed de novo; on the second, the district court's judgment is reviewed with more deference. Wojciechowicz, 582 F.3d at 66.

That the FBI agents could not have foreseen that Davis and Hussey were going to be victims is true in one narrow sense; there is no evidence that the agents focused on these two women or had special reason to believe that Flemmi or Bulger would act violently toward them. What the agents knew, as the prior chronology demonstrates, is that the agents were protecting extraordinarily violent men who had already seemingly murdered others. To this extent, it was foreseeable that Bulger and Flemmi might well kill anyone who threatened or seriously inconvenienced them. Davis and Hussey were not random victims; they had close and prolonged associations with Flemmi. The district judge thus found:

> Given [Massachusetts'] definition of foreseeability, it is easy to conclude that Davis and Hussey's deaths were the type of potential risks--violent crimes by Bulger and Flemmi--that made the FBI's conduct negligent in the first instance.

Litif, 682 F. Supp. 2d at 76.

The Massachusetts case most closely in point is Jupin v. Kask, 849 N.E.2d 829 (Mass. 2006). There, a homeowner had provided

-12-

unsupervised access to a gun collection to a young adult whom she knew "had a history of violence, had recent problems with the law, and had been under psychiatric observation" and therefore might use one of the guns "in the commission of a violent crime." Id. at 837. The young man fatally wounded a police officer with one of the guns, and the state's Supreme Judicial Court ("SJC") reversed a grant of summary judgment for the homeowner and remanded for trial. Id. at 833.

Jupin is also on point on a closely related issue, for it declares:

> It is irrelevant whether [the defendant] foresaw or should have foreseen the specific danger that occurred . . . . "It is sufficient that the same general kind of harm was a foreseeable consequence of the defendant's risk-creating conduct."

849 N.E.2d at 837 n.8 (quoting Andrew J. McClurg, Armed and Dangerous: Tort Liability for the Negligent Storage of Firearms, 32 Conn. L. Rev. 1189, 1232 (2000)). Accord Carey v. New Yorker of Worcester, Inc., 245 N.E.2d 420, 454 (Mass. 1969) ("The specific kind of harm need not be foreseeable as long as it was foreseeable . . . that there would be violence toward others.").

Massachusetts case law is equivocal where mere carelessness creates a hazard to an unlimited class of potential plaintiffs. In Kent v. Commonwealth, 771 N.E.2d 770 (Mass. 2002), a police officer, shot by a released parolee serving a life sentence in prison for second degree murder, sued Massachusetts,

arguing that the parole board had been negligent in releasing the prisoner. Although the SJC said that the parole board action was not the proximate cause, it stressed that before the shooting, custody of the parolee had been transferred by the state to the Immigration and Naturalization Service to effectuate his deportation.  Id. at 777-78.

Leavitt v. Brockton Hospital, Inc., 907 N.E. 2d 213 (Mass. 2009), is a similar example of a hedged denial of liability where the harm was more immediately due to the negligence of a third party.  There, a police officer was injured while responding to an emergency call where a patient was struck by a car when walking home from the hospital; the officer argued that the hospital had negligently released the patient without an escort. Id. at 215.  The SJC pointed to the negligent driver as an intervening cause, adding that liability might have existed had the patient directly injured a third party (for example, by driving a car home from the hospital that struck a pedestrian).  Id. at 220.

The latter caveat could easily capture our own case, so Leavitt is far from helpful to the government.  Nor is the government helped by incautiously quoting Leavitt's statement that "there is no duty to control another person's conduct to prevent that person from causing harm to a third party," 907 N.E.2d at 216; affirmatively empowering known killers to remain at large is unlikely to be what the SJC had in mind in the quoted statement.

-14-

Although foreseeability is a prime element in proximate cause, <u>Palsgraf</u> v. <u>Long Island Railroad Co.</u>, 162 N.E. 99 (N.Y. 1928), the concept is freighted with policy concerns about open-ended liability for remote effects, which courts may cut off under a variety of labels (lack of duty, unforseeability, intervening cause, scope of the risk). <u>E.g.</u>, <u>McCloskey</u> v. <u>Mueller</u>, 446 F.3d 262 (1st Cir. 2006). The concerns are especially acute where official or institutional actors are engaged in inherently dangerous activities, such as law enforcement or custodial care.

But here, as in <u>Jupin</u>, this is not a mine-run case. The FBI agents affirmatively intervened to protect Bulger and Flemmi both by tips to the men and by blocking law enforcement measures that would likely have brought them to justice before the murders of the two women. <u>See</u> <u>McCloskey</u>, 446 F.3d at 267 ("[A] defendant's duty is more limited when negligence consists of an omission rather than an act of commission."). Given the agents' knowledge of their charges' murderous inclinations, the threat to others was in broad terms foreseeable; and the FBI agents' actions were not merely negligent but reckless in the extreme.

In <u>Johnson</u> v. <u>Summers</u>, 577 N.E. 2d 301 (Mass. 1991), <u>cert. denied</u>, 502 U.S. 1093 (1992), a case involving arguably attenuated causation, the SJC cited the Restatement (Second) of Torts § 501 (1965), which says that "[t]he fact that the actor's misconduct is in reckless disregard of another's safety rather than

-15-

merely negligent is a matter to be taken into account in determining whether a jury may reasonably find that the actor's conduct bears a sufficient causal relation to another's harm to make the actor liable therefor."[4]  Id. at 306.

This brings us to McCloskey, 446 F.3d 262, heavily relied upon by the government.  There, an FBI employee failed to follow up with a wanted bank robber who called offering to surrender; the next day the robber murdered a stranger whose estate sued the federal government under the FTCA and, as here, invoked negligence under Massachusetts law.  This court agreed with the district judge that Massachusetts courts would not have imposed liability on a similarly situated private employer.

But in McCloskey, the FBI agent had done nothing other than fail to pursue a tip, in no way "taking charge" of the telephoning criminal or otherwise assuming responsibility for him.  446 F.3d at 270.  Here, by contrast, the agents deliberately intervened to prevent their own dangerous informants from being caught and prosecuted.  And, of course, their actions were not merely careless but reckless in the extreme, making the outcome--

_____

[4]Restatement (Third) of Torts § 33(b) (2010) elaborates: "An actor who intentionally or recklessly causes harm is subject to liability for a broader range of harms than the harms for which that actor would be liable if only acting negligently.  In general, the important factors in determining the scope of liability are the moral culpability of the actor, as reflected in the reasons for and intent in committing the tortious acts, the seriousness of harm intended and threatened by those acts, and the degree to which the actor's conduct deviated from appropriate care."

albeit inspecific as to the victim--eminently predictable. Johnson, 577 N.E.2d at 306.

Loss of Consortium. The district court awarded the estate of Davis' mother Olga, who died in 2007, $1 million for loss of consortium. Litif, 682 F. Supp. 2d at 82-85. At common law, a number of claims did not survive the death of the sufferer, but a Massachusetts statute preserves a variety of such claims including "[a]ctions of tort . . . for assault, battery, imprisonment or other damage to the person." Mass. Gen. Laws ch. 228, § 1 (2011). See Rendek v. Sheriff of Bristol Cnty., 797 N.E.2d 891, 891-92 (Mass. 2003). The government disputes that Olga's loss of consortium constitutes "damage to [her] person."

The government's argument rests importantly on Hey v. Prime, 84 N.E. 141 (Mass. 1908), which (interpreting the same language in a predecessor statute) held that the statute did not preserve a loss of consortium action brought by a widower because "the wrong suffered by him while personal in effect, is regarded as purely consequential in character." Id. at 143. The case is over 100 years old but was followed, somewhat more recently, in Summers v. Boston Safe Deposit & Trust Co., 16 N.E.2d 670, 672 (Mass. 1938).

However, 40 years later, the SJC held that a claim for intentional infliction of emotional distress did survive as a claim for "other damage to the person"; and the court declared that the

-17-

statute was intended to be "sufficiently dynamic to allow for a change in judicial conceptions of what types of harm constitute legally redressable 'damage to the person.'" Harrison v. Loyal Protective Life Ins. Co., 396 N.E.2d 987, 989 (Mass. 1979). It then said of Hey and other similar cases from the same time period:

> Those cases cited . . . which gave a narrow construction of 'damage to the person' were decided at a time when the general attitude of the court toward mental or emotional distress as a legally redressable harm was more restrictive than it is today.

Id.

Although the court did not formally overrule Hey v. Prime, it is not apparent why one would distinguish--from the standpoint of harm--between the emotional damage inflicted by insults or harassment and the emotional damage suffered from the loss of companionship stemming from the loss of a spouse or child. In other situations the SJC has tended to treat the two torts as closely related variants. Nancy P. v. D'Amato, 517 N.E.2d 824, 828 n.9 (Mass. 1988). Accord Agis v. Howard Johnson Co., 355 N.E.2d 315, 319-20 (Mass. 1976).

Of course, one could draw a line between wicked torts and mere carelessness, but despite the companion references to "assault, battery, [and] imprisonment," other preserved tort claims in the state statute are in no way so qualified (e.g., "for damage to real or personal property"), Mass. Gen. Laws ch. 228, § 1; nor does Harrison suggest such a distinction. The consortium loss in

-18-

this case was caused by murder at one level (Bulger and Flemmi) and patently reckless behavior at another (the agents).

The SJC declined to extend Harrison to preserve a statutory privacy claim for unlawful wiretapping, pointing out that the Harrison tort involved "severe emotional injury" while the wiretap claim had an "ephemeral quality that has undoubtedly led the Legislature to grant statutory minimum damages without any proof of harm." Pine v. Rust, 535 N.E.2d 1247, 1251 (Mass. 1989). But emotional impact is central to loss of consortium which compensates "for the loss of the companionship [and] affection . . . of one's spouse." Agis, 355 N.E.2d at 320. We agree with the Davis estate that the claim is saved by the statute.

Pain and suffering. Both the Davis and Hussey estates ask that we increase the $350,000 awarded to each by the district court for conscious pain and suffering. The district court found that

> Davis and Hussey were strangled to death. Death by asphyxiation is not immediate, so at least a few minutes must have passed from the time that these victims realized they were being murdered until they lost consciousness. The Davis family has not carried its burden of proving that Debra's final moments were more extensive than that.

Litif, 682 F. Supp. 2d at 85.

The Davis estate contests the finding condensed in the second of the two sentences just quoted--that the period of suffering was brief--by arguing that the evidence shows Debra Davis

-19-

was killed because Flemmi and Bulger thought she knew too much about the pair's relationship with Connolly.  This might make more likely the estate's proposed inference--that Flemmi and Bulger "debriefed" Davis before killing her and that at the very least there was a substantial period in which she would have apprehended death.

But the "knew too much" inference is no more than reasonable speculation and, even if assumed true as a partial motive, does not entail that Flemmi and Bulger had any reason to think that she had already confided to the police.  Other evidence to show prolonged detention (specifically, that she was dragged to a basement and her mouth was duct-taped) was found by the district judge not to be credible, Litif, 682 F. Supp. 2d at 72 n.11, and the finding has not been shown to be clear error.

Hussey does not make a comparable factual claim but does join with Davis in arguing that it was an abuse of discretion to award only $350,000 for pain and suffering.  And, as Hussey points out, the district court's description of Hussey's death suggests that even if the period was brief, it was still pretty terrible:

> Bulger grabbed Deborah Hussey from behind and scissored her neck between his forearms to crush her windpipe.  Hussey fought desperately for her life and knocked Bulger over.  When the two fell to the floor, Bulger jack-knifed his body to work his legs around Hussey's body to crush her torso.

Litif, 682 F. Supp. 2d at 73.

Under Massachusetts law, the compensation for wrongful death can include mental, as well as physical, suffering (especially that in contemplation of imminent death), Sisson v. Lhowe, 954 N.E.2d 1115 (Mass. 2011); but, unlike the calculation of economic damages, assigning a dollar figure to such an ordeal-- perhaps very brief but horrible to imagine--is very difficult. We have been hesitant to overturn an "an award of non-economic damages unless the award is either grossly disproportionate to the proven injuries or trenches upon a miscarriage of justice." Limone v. United States, 579 F.3d 79, 103 (1st Cir. 2009).

The closest thing to an objective measure is itself nothing other than the composite of subjective judgements reflected in other awards in like cases. The problem for the Davis and Hussey families is that the awards in this case are in line, even adjusting for inflation, with many awards in similar cases involving either asphyxiation or murder. Consider, for example, the following:

> Jutzi-Johnson v. United States, 263 F.3d 753, 760-61 (7th Cir. 2001) (surveying accidental drowning cases and finding the pain and suffering awards to range from $15,000 to $150,000);
>
> Miles v. Melrose, 882 F.2d 976, 980-81 (5th Cir. 1989), aff'd, 498 U.S. 19 (1990) ($140,000 for pain and suffering when victim had been stabbed or cut at least 62 times);
>
> Luecke v. Mercantile Bank of Jonesboro, 720 F.2d 15, 18 (8th Cir. 1983) ($25,000 for

bludgeoning death where victim was alive for one to five minutes before her death);

TGM Ashley Lakes, Inc. v. Jennings, 590 S.E.2d 807, 820 (Ga. App. 2003) ($2.5 million for strangulation with a stocking where the victim retained consciousness for 40 seconds to three to five minutes).

The families in this case rely on McIntyre, 447 F. Supp. 2d at 118-19. There, Bulger attempted to strangle McIntyre, who had been handcuffed and chained for five or six hours, inflicting such pain that McIntyre vomited and gasped for air, and responded "yes, please" when Bulger offered to shoot him instead. The judge in McIntyre concluded that this amounted to "torture," id. at 119, and awarded $3 million for pain and suffering.

Although McIntyre does not stand alone,[5] it appears to be at the high end of the range. And the question whether it might itself have been excessive was never presented on appeal to this court. Given that a substantial cluster of awards for similar suffering are at or below the amounts awarded in this case, $350,000 cannot be said to be so low as to represent an abuse of discretion, let alone a miscarriage of justice. Limone, 579 F.3d at 103.

Sanctions. After the final judgment, the Davis and Hussey estates moved for sanctions against the government, which

---

[5]E.g., TGM Ashley Lakes, Inc., 590 S.E.2d at 820; Stethem v. Islamic Republic of Iran, 201 F. Supp. 2d 78, 88-89 (D.D.C. 2002) ($1 million award for victim who lived several minutes after being shot).

-22-

the district court granted in part.   Davis v. United States, 739 F. Supp. 2d 64 (D. Mass. 2010).  The district court awarded $5,000 in the form of attorney's fees to each estate on the ground that the government had asserted a comparative negligence defense in bad faith and, by inference, that the purpose must have been  to harass and embarrass.  The government's appeal includes a challenge to the sanctions.

A court may sanction a completely baseless argument, e.g., Whitney Bros. Co. v. Sprafkin, 60 F.3d 8, 14 (1st Cir. 1995), although if this were taken too literally, the rubric would cover a vast number of briefs and memoranda.  Here, the district court found baseless only a single defense, asserted by the government's amendment to its answer: that the murdered women and their mothers, like the United States, "also should have known about that risk and taken steps to avoid it, and failed to do so."[6]  The government asserted that the women and their mothers

> were aware of the violent and criminal history and propensities of Stephen Flemmi but failed to take action to alert any law enforcement agency of those facts and otherwise failed to warn or protect [themselves] from the known risk of harm; and such negligence . . . caused, or contributed to, the damages complained of.

---

[6]The government withdrew the defense as asserted against Davis' deceased mother, but it remained against Hussey, her mother, and Davis.

The defense was unlikely to prevail on its own facts, especially with respect to Deborah Hussey, whom Flemmi had abused as a teenager.  While the plaintiffs' charge here was negligence, and comparative negligence is a defense, or basis for reducing damages, in Massachusetts, e.g., Haglund v. Philip Morris Inc., 847 N.E.2d 315, 323 n.9 (Mass. 2006), the FBI agents' conduct was not merely negligent but culpably reckless.  So the odds that a comparative negligence defense might succeed were surely very small.

Still, our review of Massachusetts case law--including that cited by the Davis and Hussey estates--indicates it does not explicitly rule out the defense in somewhat similar circumstances. See, e.g., Lakew v. Mass. Bay Transp. Authority, 844 N.E.2d 263, 269 (Mass. App. Ct. 2006).  So a sanction against the government could not rest merely on the asserting of a defense quite unlikely to succeed.  Rather, there would have to be something more--such as finding that the defense was employed simply in order to harass.

The district judge's decision may be read to rest in part on such an inference. A portion of the government's opening statement as to Hussey's mother, Marion Hussey, included statements like:

> That's all blood money coming to her from Flemmi from his life of crime, and she comes in here says it's not my fault. . . .  She washed his clothes after he cut the teeth out of all these people.

-24-

<u>Davis</u>, 739 F. Supp. 2d at 69.  The government continued this line of questioning when Marion Hussey testified, focusing on financial benefits she may have gained from Flemmi.  The district judge's sanction discussion pointed to these excerpts.

If the district judge reasonably concluded that the opening statement and questioning were <u>intended</u> to harass, a sanction would be permissible.  <u>United States</u> v. <u>Knott</u>, 256 F.3d 20, 36 (1st Cir. 2001), <u>cert. denied</u>, 534 U.S. 1127 (2002).  But the district court explicitly rested its finding of intent to harass in part on the premise that the defense itself was patently baseless--a view we do not share.  <u>Davis</u>, 739 F. Supp. 2d at 69.  So the finding of intent to harass must be reconsidered on remand.

In addition, the district court did not limit the sanction to Hussey but referred to "the cognate arguments sullying Debra Davis."  <u>Davis</u>, 739 F. Supp. 2d at 69.  Neither the district court nor the Davis estate has pointed to similarly specific and potentially harassing conduct directed towards Davis or her mother, other than simply raising the defense itself.  And, as already noted, we do not think that by simply raising the abstract defense the government opened itself to sanctions.

This was a set of cases with very difficult issues, much emotion, and a sprawling background that is hard enough to organize even on appeal--let alone in a full-blown trial; the district judge deserves credit for having brought the ship safely into port.  But

-25-

we have to keep in mind that both sides in a hard fought case often overdo their presentations, and misconduct sanctions are a serious business. We are confident that the district judge will take a fresh look at the matter on remand.

The judgments of the district court are <u>affirmed</u> save as to sanctions. The sanction awarded to the Davis plaintiffs is <u>reversed</u>; that awarded to the Hussey plaintiffs is <u>vacated</u> and the district court may consider on remand whether, granting that the defense was permissibly asserted, it wishes to treat the trial opening and cross examination as intentional harassment. If it does, it should make appropriate findings as well. Each side is to bear its own costs on this appeal.

<u>It is so ordered</u>.