# United States Court of Appeals
## For the First Circuit

No. 10-2434

UNITED STATES,

Appellee,

v.

T. PATRICK KEARNEY,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, U.S. District Judge]

Before

Lynch, Chief Judge,
Souter,* Associate Justice,
and Stahl, Circuit Judge.

Rheba Rutkowski, Assistant Federal Public Defender, for appellant.
Cynthia A. Young, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief, for appellee.

February 29, 2012

---

*  The Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**LYNCH**, <u>Chief Judge</u>.  T. Patrick Kearney appeals from a plea of guilty to seventeen counts of transportation, distribution, and possession of child pornography, which he did through use of the internet.  His appeal raises two important issues we have not addressed before.

Since the IP address Kearney used to accomplish his crimes was a "dynamic" and not a "static" one, he contends the affidavit in support of the search warrant was not adequate.  Even accounting for that difference, we hold that the affidavit was adequate and there was no error in the denial of the motion to suppress.  The second issue, which has divided the circuits, concerns the standards for an award of statutory restitution under 18 U.S.C. § 2259 to the victim, as well as the propriety of the $3,800 amount ordered as restitution.  The victim was, as a minor, the subject of the pornographic videos taken by her father.  The defendant possessed, transported, and redistributed those images to others.  We also find no error in the restitution award.

I.

The FBI, state, and local law enforcement agencies regularly conduct undercover operations to target individuals who use telecommunications to transmit and receive child pornography or to lure children into sexual relationships.  In May 2008, Nathan Kesterson, an internet crimes investigator of the Lexington, Virginia, police department, began communications over the internet

with an individual while posing as a fourteen-year-old female named "Julie." The website on which the communications occurred was chat-avenue.com, styled as a teen-only chat room. Kesterson communicated with a person who was identified, at this point, only by the screen name "padraigh8," and who claimed to be a twenty-eight-year-old male from Massachusetts. These communications continued, on ten separate occasions, through May and June, and padraigh8 utilized Yahoo! messenger on some of these occasions. During several of the conversations, padraigh8 sent to "Julie" child pornography videos and photographs. Kesterson was able to identify padraigh8's MySpace page and ID number, because the MySpace page bore the same name as the Yahoo! account: "padraigh8."

Kesterson contacted the FBI's Boston office about padraigh8 on May 12, 2008. The FBI assigned the case to Special Agent Jennifer Weidlich, who then served subpoenas on Yahoo! and MySpace in an attempt to determine the identity of padraigh8. The descriptions of the responses to these subpoenas set forth in Weidlich's affidavit in support of the application for a search warrant are at the heart of Kearney's Fourth Amendment claim.

The first subpoena was served on MySpace on May 22, 2008, and requested account and internet protocol (IP) address[1]

---

[1] "An IP address is the unique address assigned to every machine on the internet. An IP address consists of four numbers separated by dots, e.g., 166.132.78.215." United States v. Vázquez-Rivera, 665 F.3d 351, 354 n.5 (1st Cir. 2011) (quoting In re Pharmatrak, Inc., 329 F.3d 9, 13 n.1 (1st Cir. 2003)).

information associated with the padraigh8 MySpace page. MySpace responded, stating that the subscriber created this account on August 23, 2007, using IP address 68.116.165.4. The name of the subscriber was listed as "Padraigh NoName," with an address in Westborough, Massachusetts, and an email address of padraigh9@hotmail.com. IP log records showed that the user signed onto this MySpace account from IP address 68.116.165.4 "multiple times between" August 23, 2007, and May 22, 2008.

The second subpoena was served on Yahoo! on May 22, 2008, requesting information on the "padraigh8" account used to communicate with "Julie." Yahoo!'s response stated that the account was created on October 24, 2000, by "Padraigh No Name," with an alternate email address of padraigh9@hotmail.com provided -- the same address which was used to create the MySpace page. Yahoo! also informed Weidlich that padraigh8 accessed his account from IP address 68.116.165.4 a total of 288 times "between" April 7, 2008, and May 21, 2008.

With that information, Weidlich served a third subpoena on Charter Communications on June 4, 2008, requesting the identity of the owner of the IP address 68.116.165.4 between the dates of May 20, 2008, and May 22, 2008.[2] The company responded by stating that the IP address belonged to Patrick Kearney, and provided

---

[2] The affidavit does not explain how the investigators determined that IP address 68.116.165.4 was owned by Charter Communications.

Kearney's home address -- 11 Morgan Drive, North Grafton, Massachusetts -- telephone number, and email accounts. Kearney opened the Charter account on August 23, 2003. The information provided by Charter Communications was the only connection between the IP address and an identifiable individual.

After receiving the response from Charter Communications, Weidlich cross-referenced the information about Kearney against the state Registry of Motor Vehicles database, which confirmed that Kearney resided at 11 Morgan Drive.

On the basis of the affidavit supplied by Weidlich, a warrant was issued by a magistrate judge on July 7, 2008, to search the 11 Morgan Drive residence. The warrant authorized agents to seize evidence of the commission of a criminal offense, contraband, fruits of a crime, and property designated and intended for use, and that had been used, as a means of committing certain criminal offenses -- distribution and possession of child pornography, in violation of 18 U.S.C. § 2252(a)(2) and (a)(4)(B), as well as attempt to travel interstate for the purpose of engaging in illicit sexual conduct with a minor, in violation of 18 U.S.C. § 2423(b) and (e).

The warrant was executed early in the morning of July 10, 2008, by eight FBI agents and two Grafton police officers. Kearney and his girlfriend were the only occupants of the house. The officers first did a protective sweep, as they had information that

Kearney had a firearm.  He did, and he showed the officers where the gun was, and the officers secured it.  Kearney agreed to talk with the officers during the search, and made a variety of statements, including that he knew the images and videos he sent to "Julie" depicted children under the age of eighteen.  He also admitted to downloading child pornography and storing it on his computer.  The officers executing the warrant seized five computers and a variety of associated equipment.

Kearney was arrested on a complaint on July 25, 2008.  A seventeen-count indictment issued on August 20, 2008, charging Kearney with eight counts of transportation of child pornography, eight counts of distribution of child pornography, and one count of possession of child pornography, in violation of 18 U.S.C. § 2252(a)(1), (a)(2), and (a)(4)(B), respectively.  Kearney pled not guilty to all counts on August 25, 2008.

On August 21, 2009, Kearney filed a motion to suppress, arguing (1) that the affidavit submitted in support of the search warrant application did not demonstrate the existence of probable cause and (2) the agents did not act in good faith reliance on the affidavit and so the search was not saved by the good faith exception.[3]  The government opposed the motion, and a hearing took

_____

[3] Before the district court, Kearney also argued that the statements he made while the officers executed the search warrant were obtained in violation of his Miranda rights.  The district court rejected his argument, and Kearney does not raise that claim on appeal.

place on October 29, 2009. On November 30, 2009, the district court denied the motion to suppress. United States v. Kearney, No. 08-40022, 2009 WL 4591949 (D. Mass. Nov. 30, 2009). Kearney moved to reconsider, and that motion was denied on December 14, 2009.

On March 8, 2010, Kearney conditionally pled guilty to all counts at a change of plea hearing. Kearney reserved his right to appeal the denial of his motion to suppress.

On May 13, 2010, the government filed a motion requesting restitution under 18 U.S.C. § 2259 for "Vicky." "Vicky" was the child subject of one of the pornographic videos which Kearney possessed, transported, and distributed. She was a ten- or eleven-year-old child at the time the video was made and is now in her early twenties. In § 2259, Congress required courts to "order restitution" in "the full amount of the victim's losses" for "any offense" under Title 18, Chapter 110 of the United States Code, which includes 18 U.S.C. § 2252. 18 U.S.C. § 2259(a), (b)(1). The prosecution here proposed "an award of no less than $3,800," by averaging the awards of restitution Vicky had received in thirty-three other child pornography cases, and viewing the amount in relation to her overall documented claims of losses. Kearney opposed the motion. Kearney also filed a motion for a separate hearing on the restitution issue, which the district court denied.

The government's request for restitution was supported by affidavits and a letter provided by Vicky's attorney, with attached

-7-

documentation. On November 18, 2009, Vicky's attorney had received a notification letter from the federal Victim Notification System providing information about the prosecution of Kearney.[4] By letter of December 31, 2009, Vicky's attorney requested $226,546.10 in restitution, including $188,705 in future counseling expenses, $27,341.10 in expenses for records, evaluations, and other supporting evidence regarding the restitution claim, and $10,500 in attorneys' fees. As said, the prosecution actually sought the far smaller amount of restitution of no less than $3,800.

The support for the restitution claim included two expert reports from a psychologist, Dr. Green, as well as statements from Vicky, her mother, and her stepfather. Dr. Green's reports were based on over eight hours of interviews with Vicky, several psychological tests and assessments of Vicky, interviews with Vicky's mother and stepfather, and a review of numerous written records about Vicky, including her therapy records.

---

[4] The Department of Justice's Victim Notification System (VNS) "provides federal crime victims with information on scheduled court events, as well as the outcome of those court events. It also provides victims with information on the offender's custody status and release." Automated Victim Notification System, U.S. Dep't of Justice, http://www.justice.gov/criminal/vns/about/doj-avns.html (last visited Feb. 24, 2012). It appears to be the mechanism which implements the statutory obligation of the Department of Justice and other federal agencies "engaged in the detection, investigation, or prosecution of crime" to "make their best efforts to see that crime victims are notified of, and accorded" certain rights, 18 U.S.C. § 3771(c)(1), including "[t]he right to full and timely restitution as provided in law," id. § 3771(a)(6).

The first report, from May 2009, made clear that Vicky has suffered immensely not only from the initial creation of the child pornography depicting her sexual exploitation and abuse, but also from the continued dissemination and viewing of that pornography. The report explains that Vicky has suffered "sexual victimizations and exploitations," in addition to the initial victimization by her biological father's creation of child pornography using her. This latter category of harm included "[t]he subsequent distribution of copious amounts of child pornographic images involving her egregious victimization and exploitation throughout the World Wide Web," and "[t]he downloading and viewing of images of the above criminal victimizations by multiple individuals on a continuing basis." The report explains that Vicky "has suffered significant, permanent psychological damage as a direct result of the knowledge that images of her victimization, humiliation and exploitation have been downloaded and viewed by numerous individuals. She will continue to suffer from the knowledge and belief that those images of her childhood abuse are at high probability to continue to be downloaded for prurient purposes."

The expert report details the wide range of negative impacts that Vicky has suffered, and will continue to suffer, from the dissemination of the child pornography depicting her. These harms include: impact on her ability to succeed academically, anger

and resentment, anxiety, depression, distrust of men, insomnia, reactivation of trauma-related reminders, and shame and embarrassment.

The report makes clear that these harms are the direct result of the dissemination and possession of the child pornography. It explains that the "discovery of the downloads" was a "powerful contributing factor[] to her anxiety." It continues: "[d]iscovery of the distribution of her images on the internet and viewing by persons interested in child pornography was clearly devastating to her and also contributed to a profound sense of sadness, despair and grief, that continues to a moderate degree to the present time." The report states that "[t]he knowledge of the proliferation of her abuse through the internet has exponentially added to the types of triggers that can reactive [sic] trauma-related thoughts or feelings," including "[e]ven a look or gesture or touch by a male."

The report also detailed harms from an event in which Vicky was harassed by an individual who had acquired the child pornography depicting her. This individual had contacted her over MySpace, stating that he had been looking for her for five years, stated she had been a willing participant in the child pornography,

expressed interest in making a pornographic video with her, and demanded her cell phone number.[5]

The report concluded that "[t]he knowledge of the dissemination and proliferation of the images of her at her times of greatest humiliation and degradation constitutes a 'Type II' trauma," which "represents a chronic, toxic condition . . . which continuously works like corrosive acid on the psyche of the individual." This type of trauma, according to the expert report, is equivalent to that suffered by those who have lived near a war zone.

The report also concluded that Vicky will need extensive treatment over many years to address these psychological issues. The report contained a detailed breakdown of the costs of Vicky's projected treatment. The largest portion of those costs was for individual psychotherapy sessions. The report projected that she would need psychotherapy on a lifetime schedule: once per week for the next four years, for a total of $35,000, then once every two weeks for the following three years, costing an additional $13,125, then for the next twenty-five years, up to once per month, for a projected additional cost of $51,600. The total projected individual therapy costs were $99,725. In addition to those costs, the report projected additional costs for psychiatric medication

---

[5] He was ultimately charged with possession of child pornography in the District of Nevada.

management, family therapy, and relationship therapy, bringing the total costs to between $126,365 and $128,005. These costs apparently do not include the actual costs to her of medication.

The first report proved overly optimistic. The second report, dated December 2009, stated that Vicky's mental-health status had "significantly deteriorated." This was due, in part, to the discovery of additional possessors and distributors of the child pornography depicting her. It was also due, in part, to her appearance in court to read a victim-impact statement, in another case involving multiple defendants. This resulted in "retraumatization," as Vicky discovered additional information about the defendants who had possessed images of the child pornography depicting her. She was exposed to "additional, unforeseen ways" that the child pornography depicting her was being used, including the creation of compilation videos containing recent images of her. Vicky found this additional knowledge of particular defendants' conduct "extraordinarily distressing and frightening at multiple levels."

Beyond that, as had happened before, several others who had acquired the child pornography depicting her had attempted to make contact with her. These other efforts at contact greatly upset her and represented "an added, ubiquitous, unpredictable threat to her safety." The discoveries "enhanc[ed] her sense of vulnerability to the nameless horde of persons who are obsessed

-12-

with her."  Vicky continued "to affirm that the knowledge that there are those downloading the images of crimes being committed for their own personal sexual interests continues to have [a] negative impact on her sense of security and personal privacy."

The expert report concluded that "she has found the wake of her father's abuse to pale in comparison to the proliferating implications of his heinous crimes against her being recorded for anyone so motivated and inclined to view for their own unknowable purposes.  She has been appalled and confused by the discovery of the hundreds, if not thousands, of seemingly disturbed individuals. For all she knows, based on her experiences . . . , a number of these individuals also pose a danger to children and possibl[y] even to herself."  The second expert report contained a cost estimate, revised upward from the earlier estimate to between $166,065 and $188,705, in light of Vicky's worsened condition. There were new costs due to the recommendation of a five-week residential treatment program that Dr. Green had not initially believed was necessary at the time of the first report.  Such treatment was now necessary because "there [was] too great a reactivation of symptoms for her to achieve the best results on an outpatient, once weekly basis."  The projected cost for such a five-week program was $39,700.

On October 22, 2010, during Kearney's sentencing hearing, the prosecutor read victim impact statements prepared by Vicky.

-13-

The statements emphasized the harm Vicky has suffered, including the fact that additional distribution and possession of the videos depicting her exacerbates her emotional injury. Vicky explained that she is "living every day with the horrible knowledge that someone somewhere is watching the most terrifying moments of my life and taking grotesque pleasure in them." She explained that this knowledge "has given me a paranoia. I wonder if the people I know have seen these images. . . . Because the most intimate parts of me are being viewed by thousands of strangers and traded around, I feel out of control." This "paranoia" was heightened by the fact that "[s]ome of these perverts have tried to contact me. . . . I wish I could one day feel completely safe, but as long as these images are out there, I never will." Because of these attempts at contact, Vicky "live[s] in fear that any of them may try to find me and contact me and do something to me."

Vicky made clear that each individual who possessed and distributed images harmed her: "Every time [the videos] are downloaded, I'm exploited again, my privacy is breached, and my life feels less and less safe." She also explained that "for each one of the defendants you see, the fact that he has downloaded the images of what has happened to me hurts me very much." These harms included panic attacks, flashbacks, trouble sleeping, a fear of groups and crowds, and leaving college due to panic attacks; these

harms were "for the biggest part because of the men who are downloading the pictures and videos of me."

Vicky's victim impact statements ended with a request for restitution; she asked "that each one do something to help make up for the harm that he has caused me by helping me to pay for the counseling that I need."

The district court found that Kearney had proximately caused Vicky to incur losses within the meaning of § 2259, and adopted the government's proposed $3,800 restitution figure. Kearney objected to the restitution award at sentencing. The district court also found that Kearney's guideline range was 168 to 210 months, and sentenced Kearney to 108 months. Kearney appealed.

II.

A.        The Search Warrant Affidavit and Probable Cause

Our "review of the denial of a motion to suppress is bifurcated: a district court's legal conclusion that a given set of facts constituted probable cause will be reviewed de novo, whereas factual findings are reviewed for clear error." United States v. McMullin, 568 F.3d 1, 5 (1st Cir. 2009). We review de novo the district court's determination of whether the good-faith exception to the exclusionary rule applies. Id.

"Probable cause to issue a search warrant exists when given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will

be found in a particular place." Id. at 6 (omission in original) (quoting United States v. Reiner, 500 F.3d 10, 15 (1st Cir. 2007)) (internal quotation marks omitted).

Kearney argues that the affidavit does not tie his ownership of the IP address on May 20-22, 2008, to any unlawful conduct, and that because his IP address was "dynamic" in nature, the fact that he owned or possessed it on those three days says nothing about whether he possessed the address before or after that period.[6] According to the affidavit of Kearney's computer forensics expert, a "dynamic" IP address is an IP address that an internet service provider (ISP) may change after a certain number of hours, days or weeks logged onto the system. Kearney's expert also stated that the frequency with which an ISP changes a user's dynamic IP address is determined by the ISP; some ISPs change addresses frequently, while others may not change dynamic addresses for months or even years. The user's conduct may also impact whether a dynamic address is changed: some ISPs do not change dynamic IP addresses unless a user disconnects his or her router or modem.

_____

[6] The evidence provided by Kearney that his IP address was dynamic, rather than static, was a printout of Charter Communications's "Frequently Asked Questions" webpage, which explained that Charter customers "are provided a dynamic IP address unless a static IP address was specifically requested." The government does not dispute that Kearney's IP address was dynamic in nature.

Many facts relevant to the probable cause determination are undisputed. The relevant Yahoo! account was used for transmitting child pornography in May and June of 2008. The MySpace account had the same name as the Yahoo! account and was created using one of the same email addresses used to create the Yahoo! account, leading to the reasonable inference that whoever possessed the MySpace account also possessed the Yahoo! account. IP address 68.116.165.4 repeatedly accessed both accounts during certain periods of time. Kearney possessed IP address 68.116.165.4 during the May 20-22, 2008, period, during which no chats with "Julie" took place.

Kearney's challenge depends upon his particular reading of the affidavit and the nature of dynamic IP addresses. He contends that the affidavit fails to establish that IP address 68.116.165.4 accessed the Yahoo! or MySpace accounts during the May 20-22, 2008, period. The affidavit states that "IP log records from MySpace show that the user signed onto this MySpace account from IP address 68.116.165.4 multiple times between 8/23/07 and 5/22/08." The affidavit also states that "According to Yahoo!, *padraigh8* accessed his account 288 times utilizing IP protocol address 68.116.165.4 between 4/7/08 and 5/21/08." Kearney argues that the use of the word "between" fails to establish that the MySpace and Yahoo accounts were accessed on May 22 and May 21, respectively, because the use of "between" in connection with dates

-17-

simply indicates that the event took place at some point between the specified start and end date, rather than on the specified start or end date. Kearney then argues that because he possessed a dynamic IP address, his possession of IP address 68.116.165.4 between May 20 and 22 says nothing about whether he possessed it on any other date, because dynamic IP addresses are frequently re-assigned to different users.

Like the district court, we reject Kearney's argument. As the district court found, the affidavit, reasonably read, establishes that IP address 68.116.165.4 accessed the MySpace and Yahoo! accounts on May 22 and 21, respectively. See Kearney, 2009 WL 4591949, at *6-7. In this context, a common-sense understanding of how the word "between" is used is that the end dates specified were the last date of access. As a matter of common usage, the two dates on either side of "between" in this context are typically used to specify the first and the last occurrence of the relevant event or activity. Moreover, the variance in the end dates for the two subpoenas supports this reading. It is reasonable to understand the "between 8/23/07 and 5/22/08" description of the MySpace log records and the "between 4/7/08 and 5/21/08" description of the Yahoo! log records as being written in this manner because the last date specified was, in fact, the last date IP address 68.116.165.4 accessed the account.

Kearney argues that the last date simply reflected the date the subpoena was sent, May 22. However, this argument does not explain why the Yahoo! end date was given as May 21, as both subpoenas were issued on May 22.

The fact that the affidavit establishes that the Yahoo! account was accessed by Kearney on May 21 and the MySpace account was accessed by him on May 22, along with the other information, establishes probable cause. It is undisputed that these accounts were the conduits for child pornography to be transmitted to "Julie." And it is reasonable to infer that whoever accessed these accounts on May 21 and 22, 2008, was also the user of these accounts earlier that month and in June 2008 to engage in the communications with "Julie."

Further supporting the existence of probable cause is the sheer number of times the Yahoo! account was accessed from IP address 68.116.165.4 during the April 7, 2008, to May 21, 2008, period -- 288 times. Kearney's expert testified that ISPs sometimes keep dynamic IP addresses the same for months, or even years. The high number of accesses of the Yahoo! account from the same IP address over a relatively short period of time shortly before the May 20 to 22 period when it was clear that Kearney possessed the IP address supports a finding of probable cause here. Also noteworthy is that during a chat on June 13, 2008, padraigh8

told "Julie" that his last name was "Carney" -- a variant of "Kearney."

It is true the affidavit could have been drafted to make it indisputably clear that Kearney accessed the accounts on May 21 and 22; but that does not mean that there was a failure to establish probable cause. The affidavit could easily have made explicit that there were connections on both the first and last date. Indeed, the Department of Justice's manual cautions investigators to make sure that the ISP "identif[ies] which of its customers was assigned [the relevant] IP address <u>at the relevant time</u>." Computer Crime & Intellectual Prop. Section, Dep't of Justice, <u>Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations</u> 65, 242 (3d ed. 2009) (emphasis added), <u>available at</u> http://www.cybercrime.gov/ssmanual/ ssmanual2009.pdf.

The question here is simply whether, "given all the circumstances set forth in the affidavit . . . , there [was] a fair probability that contraband or evidence of a crime [would] be found" in Kearney's residence. <u>Illinois</u> v. <u>Gates</u>, 462 U.S. 213, 238 (1983). That standard was satisfied and the district court did not err in denying Kearney's motion to suppress.[7]

---

[7] As a result, we need not address the district court's conclusion that even if the affidavit did not establish probable cause, the good-faith exception to the exclusionary rule applies. <u>United States</u> v. <u>Kearney</u>, No. 08-40022, 2009 WL 4591949, at *7-8 (D. Mass. Nov. 30, 2009).

B.        The Restitution Order

We review orders of restitution for abuse of discretion, reviewing legal questions de novo and subsidiary findings of fact for clear error.  United States v. Janosko, 642 F.3d 40, 41 n.1 (1st Cir. 2011); United States v. Mahone, 453 F.3d 68, 73 (1st Cir. 2006).

Kearney raises three challenges to the $3,800 restitution order issued under 18 U.S.C. § 2259.  He argues (1) that Vicky was not a "victim" within the meaning of § 2259(c), (2) that § 2259 imposes a proximate cause requirement and that requirement is not satisfied here, and (3) that even if Vicky was a victim, and proximate cause exists, the district court lacked a reasonable basis for the $3,800 amount awarded.

These are questions of first impression for this circuit. A number of circuits have recently been faced with similar questions regarding § 2259.  United States v. Evers, No. 08-5774, 2012 WL 413810 (6th Cir. Feb. 10, 2012) (to be published in F.3d); United States v. McGarity, No. 09-12070, 2012 WL 370104 (11th Cir. Feb. 6, 2012) (to be published in F.3d); United States v. Aumais, 656 F.3d 147 (2d Cir. 2011); United States v. Kennedy, 643 F.3d 1251 (9th Cir. 2011); United States v. Monzel, 641 F.3d 528 (D.C. Cir. 2011), cert. denied, 132 S. Ct. 756 (2011); United States v. Wright, 639 F.3d 679 (5th Cir. 2011), reh'g en banc granted, No. 09-31215, 2012 WL 248828 (Jan. 25, 2012); In re Amy Unknown, 636

-21-

F.3d 190 (5th Cir. 2011), reh'g en banc granted, Nos. 09-41238, 09-41254, 2012 WL 248829 (Jan. 25, 2012); United States v. McDaniel, 631 F.3d 1204 (11th Cir. 2011); United States v. Laney, 189 F.3d 954 (9th Cir. 1999); United States v. Crandon, 173 F.3d 122 (3d Cir. 1999).

We start with the restitution statute before turning to Kearney's arguments.

1.    The Statutory Restitution Scheme Under 18 U.S.C. § 2259

The particular restitution statute at issue is 18 U.S.C. § 2259. This provision was enacted as a portion of Title IV, "Violence Against Women," of the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 40113, 108 Stat. 1796, 1907, and amended (with respect to its procedural provisions) by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, § 205, 110 Stat. 1214, 1231. Section 2259, which is entitled "Mandatory restitution," provides in full:

> (a) IN GENERAL.--Notwithstanding section 3663 or 3663A, and in addition to any other civil or criminal penalty authorized by law, the court shall order restitution for any offense under this chapter.
>
> (b) SCOPE AND NATURE OF ORDER.--
>
> > (1)    DIRECTIONS.--The order of restitution under this section shall direct the defendant to pay the victim (through the appropriate court mechanism) the full amount of the victim's losses as determined by the court pursuant to paragraph (2).

-22-

(2) ENFORCEMENT.--An order of restitution under this section shall be issued and enforced in accordance with section 3664 in the same manner as an order under section 3663A.

(3) DEFINITION.--For purposes of this subsection, the term "full amount of the victims' losses" includes any costs incurred by the victim for--

> (A) medical services relating to physical, psychiatric, or psychological care;

> (B) physical and occupational therapy or rehabilitation;

> (C) necessary transportation, temporary housing, and child care expenses;

> (D) lost income;

> (E) attorneys' fees, as well as other costs incurred; and

> (F) any other losses suffered by the victim as a proximate result of the offense.

(4) ORDER MANDATORY.--(A) The issuance of a restitution order under this section is mandatory.

> (B) A court may not decline to issue an order under this section because of–

>> (i) the economic circumstances of the defendant; or

>> (ii) the fact that a victim has, or is entitled to, receive compensation for his or her injuries from the

proceeds of insurance or any other source.

> (c) DEFINITION.--For purposes of this section, the term "victim" means the individual harmed as a result of a commission of a crime under this chapter, including, in the case of a victim who is under 18 years of age, incompetent, incapacitated, or deceased, the legal guardian of the victim or representative of the victim's estate, another family member, or any other person appointed as suitable by the court, but in no event shall the defendant be named as such representative or guardian.

18 U.S.C. § 2259.

There are other statutes, such as the Mandatory Victims Restitution Act of 1996 (MVRA), id. § 3663A, and the Victim and Witness Protection Act of 1982 (VWPA), id. § 3663, governing restitution for other types of crimes. While some language in the three statutory restitution schemes is the same, there are differences and those differences must be given weight.[8] In the statute involved here, Congress was careful to specify some definitions of recoverable losses where it had not done so in other restitution statutes. Compare 18 U.S.C. § 2259(b)(3) (defining

---

[8] Pursuant to 18 U.S.C. § 2259(b)(2), restitution orders under § 2259 "shall be issued and enforced in accordance with section 3664," which also governs restitution awards under the MVRA and VWPA, see id. §§ 3663(d), 3663A(d). Section 3664 is entitled "Procedure for issuance and enforcement of order of restitution," and contains a variety of procedural provisions regarding restitution orders. One provision of § 3664 is relevant here: "[a]ny dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence. The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government." Id. § 3664(e).

compensable losses), with id. § 3663(b) (defining compensable losses), and id. § 3663A(b) (same). Congress also gave a different definition of victim, as explained below.

Several features of this statutory scheme are relevant here. Like the MVRA, but unlike the VWPA, restitution under § 2259 is mandatory, if the requirements of the section are satisfied. Id. § 2259(b)(4)(A); see also id. § 3663A(a)(1) (under the MVRA, the court "shall order" restitution); id. § 3663(a)(1)(A) (under the VWPA, the court "may" order restitution); see also S. Rep. No. 103-138, at 56 (1993) (explaining that § 2259 was designed to "requir[e] the court to order the defendant to pay the victim's expenses"). Restitution orders under this section may only be issued for offenses "under this chapter." 18 U.S.C. § 2259(a). Chapter 110 of Title 18 covers several categories of offenses, including possession, transportation, and distribution of child pornography. Id. § 2252. Restitution may only be issued to a "victim," id. § 2259(b)(1), which term is defined as "the individual harmed as a result of a commission of a crime under this chapter," id. § 2259(c). This definition of victim is broader than that of the MVRA and VWPA, which define victim as "a person directly and proximately harmed as a result" of a specified offense. Id. § 3663(a)(2); id. § 3663A(a)(2) (same).

Further, restitution is for the "costs incurred by the victim," which are illuminated in six enumerated categories of

losses. Id. § 2259(b)(3). The section defines what is meant by restitution as being "the full amount of the victim's losses," id. § 2259(b)(1), which includes any costs incurred by the victims for specified items, id. § 2259(b)(3). These losses include "medical services relating to physical, psychiatric, or psychological care," id. § 2259(b)(3)(A), and other items.[9] Thus the "full amount" includes such losses and Congress determined that the victims of crimes under this statute were likely to suffer losses in these categories. The specified loss categories expanded the usual categories of "restitutionary" losses. For example, they were not limited to more usual examples of restitution such as payment of the value of a car where the defendant stole the victim's car. Cf. id. § 3663A(b)(1) (restitution for certain offenses resulting in damage to or loss of property requires return of the property or compensation in an amount equal to the value of the property). The loss definition for the crimes under this chapter also contains a general catch-all provision for "any other losses suffered by the victim as a proximate result of the offense." Id. § 2259(b)(3)(F).

---

[9] Kearney raises no claim that an award for future counseling costs is not authorized by the statutory language of "costs incurred," so we need not decide this issue. We do note that the four circuits that have considered the matter have concluded that such future expenses are compensable. See United States v. Pearson, 570 F.3d 480, 486 (2d Cir. 2009) (per curiam) (holding that "§ 2259 authorizes compensation for future counseling expenses"); United States v. Danser, 270 F.3d 451, 455 (7th Cir. 2001) (same); United States v. Julian, 242 F.3d 1245, 1247 (10th Cir. 2001) (same); United States v. Laney, 189 F.3d 954, 966-67 (9th Cir. 1999) (same).

We view the issues raised by the restitution scheme in three steps: (1) the requirements for an individual to be considered a "victim" within the meaning of § 2259(c); (2) the causation requirement applicable to determining which "costs incurred by the victim," id. § 2259(b)(3), are compensable; and (3) assuming that a victim has identified compensable costs that satisfy the causation requirement, whether the district court made a reasonable determination of a dollar figure. See Kennedy, 643 F.3d at 1263; see also McGarity, 2012 WL 370104, at *34. Each of these issues involves assessment of the legal standard that applies as well as whether the particular facts of this case satisfy the applicable standard. There is some overlap, of course, among these issues.

### 2.   Victim Status

Under § 2259, restitution may only be awarded to a "victim," which "means the individual harmed as a result of a commission of a crime under this chapter." 18 U.S.C. § 2259(c). Kearney contends that it is "unclear" that Vicky is a victim of Kearney's conduct, with little explanation.

Vicky is plainly a victim of Kearney's crimes. Any argument that Vicky has not suffered harm as a result of Kearney's crimes defies both fact and law. The Supreme Court has repeatedly explained, for thirty years, that individuals depicted in child pornography are harmed by the continuing dissemination and

possession of such pornography containing their image. Such materials are "a permanent record of the children's participation and the harm to the child is exacerbated by their circulation." New York v. Ferber, 458 U.S. 747, 759 (1982); see also United States v. Williams, 553 U.S. 285, 303 (2008) (such materials "constitute 'a permanent record' of the children's degradation whose dissemination increases 'the harm to the child'" (quoting Ferber, 458 U.S. at 759)); Osborne v. Ohio, 495 U.S. 103, 111 (1990) ("[T]he materials produced by child pornographers permanently record the victim's abuse. The pornography's continued existence causes the child victims continuing harm by haunting the children in years to come."). Indeed, the Court has stated that "as a permanent record of a child's abuse, the continued circulation itself would harm the child who had participated. Like a defamatory statement, each new publication of the speech would cause new injury to the child's reputation and emotional well-being." Ashcroft v. Free Speech Coal., 535 U.S. 234, 249 (2002) (emphasis added). These statements were well supported by medical and social science. See Ferber, 458 U.S. at 759-60 & nn.9-10 (collecting authority).

Congress was well aware of the Supreme Court's explanation of the "continuing harm," Osborne, 495 U.S. at 111, caused by possession and distribution of child pornography at the time it enacted § 2259. Indeed, the sponsor of the Senate

amendment that resulted in 18 U.S.C. § 2252(a)(4)(B), which criminalizes the possession of child pornography, explained that the provision was "consistent with the U.S. Supreme Court's decision in Osborne."  136 Cong. Rec. 16,292 (1990) (statement of Sen. Strom Thurmond).[10]

Congress has also since repeatedly emphasized, in legislation amending the laws governing child pornography, the continuing harm the distribution and possession of child pornography inflicts.  See Effective Child Pornography Prosecution Act of 2007, Pub. L. No. 110-358, Tit. I, § 102(3), 122 Stat. 4001, 4001 ("Child pornography is a permanent record of a child's abuse and the distribution of child pornography images revictimizes the child each time the image is viewed."); Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, § 501(2)(D), 120 Stat. 587, 624 ("Every instance of viewing images of child pornography represents a renewed violation of the privacy of the victims and a repetition of their abuse."); Child Pornography Prevention Act of 1996, Pub. L. No. 104-208, § 121(1)(2), 110 Stat. 3009, 3009-26

---

[10]  Congress has been particularly cognizant of the Supreme Court's rulings in the child pornography context, given concerns that overbroad attempts to regulate child pornography could result in the legislation being invalidated on First Amendment grounds. Indeed, the committee report to the first federal law criminalizing the production and distribution of child pornography explained that "[s]ince the question of constitutionality is so essential to the effectiveness of the bill, it deserves further discussion," and the report contained an extensive discussion of Supreme Court precedent on the matter.  S. Rep. No. 95-438 (1977) (Conf. Rep.), reprinted in 1978 U.S.C.C.A.N. 40, 49.

("[C]hild pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years . . . .").

Also noteworthy is the choice by Congress in § 2259 to define "victim" more broadly than in other restitution statutes. Under § 2259, a victim is "the individual harmed as a result of a commission of a crime under this chapter." 18 U.S.C. § 2259(c). Other restitution statutes, by contrast, define victim more narrowly, as "a person directly and proximately harmed as a result of the commission of an offense" for which restitution can be ordered. Id. § 3663(a)(2) (emphasis added); see also id. § 3663A(a)(2); id. § 2327(c). Indeed, the "directly and proximately" language was added to § 3663(a)(2) at the same time Congress amended § 2259 with respect to its procedural provisions, see AEDPA, § 205, 110 Stat. at 1229-31, but Congress expressly declined to alter the definition of victim under § 2259, see S. Rep. No. 104-179, at 14 (1995) ("No change is made to the scope of restitution required under the Violence Against Women Act provisions . . . .").

Not surprisingly, the circuit courts agree that those children depicted in child pornography are victims within the meaning of § 2259(c). Every circuit to consider the matter has found that those depicted by child pornography are "victims" of the

crimes of possession and distribution within the meaning of § 2259(c). See McGarity, 2012 WL 370104, at *36 (finding victim status based on Ferber); Aumais, 656 F.3d at 152 (quoting Ferber on victim status); Kennedy, 643 F.3d at 1263 (finding a possessor of child pornography harms those depicted even if the depicted individuals have no knowledge of the possessor's identity); In re Amy Unknown, 636 F.3d at 200-01 (those depicted in child pornography are victims under the reasoning of Ferber); McDaniel, 631 F.3d at 1208 ("McDaniel 'harmed' Vicky under the meaning of section 2259(c) by possessing images of her sexual abuse as a minor."); see also Evers, 2012 WL 413810, at *8 (holding that the legal guardian of a minor who was the subject of child pornography was a victim within the meaning of § 2259(c)).

### 3.    Proximate Cause

Kearney's second argument is that only those "costs incurred by the victim" which occur as a proximate result of the offense conduct of the defendant are compensable under 18 U.S.C. § 2259(b)(3). Kearney views this requirement as excluding the award of restitution here. We disagree.

It is clear to us that Congress intended some causal link between the losses and the offense to support the mandated restitution. However, in this statute, Congress also did not specify the level of causation except in one place -- the catch-all clause of the definition of losses, 18 U.S.C. § 2259(b)(3)(F).

-31-

With the exception of only a Fifth Circuit panel (which relied on the difference in language between the catch-all clause and the other clauses) in an opinion which has been vacated for rehearing en banc, In re Amy Unknown, 636 F.3d at 198-201, all other circuit decisions have said they interpret the statute as using a proximate causation standard connecting the offense to the losses. See Evers, 2012 WL 413810, at *10-11; McGarity, 2012 WL 370104, at *38; Aumais, 656 F.3d at 153; Kennedy, 643 F.3d at 1261; Monzel, 641 F.3d at 536-37; McDaniel, 631 F.3d at 1208-09; Crandon, 173 F.3d at 125-26. This interpretation is supported by a variety of considerations, explained in Monzel, 641 F.3d at 535-37.[11] The government does not dispute that a proximate cause test applies.

This seeming agreement on a standard suggests more harmony than there is. On rather similar facts the circuits have reached different outcomes in applying the proximate cause test, and those outcomes cannot be entirely explained by differences in the facts of record. Compare Monzel, 641 F.3d at 537-40 (finding proximate cause but remanding to determine the amount of harm so caused), and McDaniel, 631 F.3d at 1209 (holding that the district court did not clearly err in finding proximate cause), with

---

[11] We note one other interpretative aid not mentioned by the other circuits to assess this issue: the Senate committee report on the bill including § 2259, which explained that "[t]his section requires sex offenders to pay costs incurred by victims as a proximate result of a sex crime." S. Rep. 103-138, at 56 (1993) (emphasis added) (committee report on the Violence Against Women Act, which contained the provision that became 18 U.S.C. § 2259).

<u>McGarity</u>, 2012 WL 370104, at *37-38 (finding that proximate cause was not established); <u>Aumais</u>, 656 F.3d at 154-55 (same), <u>and</u> <u>Kennedy</u>, 643 F.3d at 1263-65 (same).  In our view, any proximate cause standard must be understood and applied in terms of the precise language of the statute and the clear intentions of Congress.

Many courts and commentators have opined over the years on what is meant by proximate causation, particularly in contrast with "but-for" causation.  <u>See, e.g.,</u> <u>Marshall</u> v. <u>Nugent</u>, 222 F.2d 604 (1st Cir. 1955); <u>Palsgraf</u> v. <u>Long Island R.R. Co.</u>, 162 N.E. 99 (N.Y. 1928); <u>see</u> <u>also</u> <u>Holmes</u> v. <u>Sec. Investor Prot. Corp.</u>, 503 U.S. 258 (1992).  The differences are usually discussed in tort cases. Perhaps Congress meant to incorporate general common-law principles of tort law for all the loss causation categories of § 2259, although it did not say so explicitly, and Congress surely did not mean to adopt principles at odds with its objectives.[12]

To start, we see no conflict between traditional notions of proximate cause and a finding of proximate cause on these facts. In a Federal Tort Claims Act case applying Massachusetts tort law, this court discussed some differences between proximate cause and

---

[12]  One other circuit has explained that, while 18 U.S.C. § 2259 is a criminal restitution statute, "it functions much like a tort statute by directing the court to make a victim whole for losses caused by the responsible party," and thus "tort doctrine informs our thinking" with respect to the statute.  <u>United States</u> v. <u>Monzel</u>, 641 F.3d 528, 535 n.5 (D.C. Cir. 2011), <u>cert. denied</u>, 132 S. Ct. 756 (2011).

"but-for" causation. Davis v. United States, No. 10-1418, 2012 WL 170871, at \*3-6 (1st Cir. Jan. 20, 2012) (to be published in F.3d). "As it happens, proximate cause can also raise legal issues as well as factual ones; but-for causation is almost always a factual issue." Id. at \*3. As for proximate cause, we said that "[a]lthough foreseeability is a prime element in proximate cause, the concept is freighted with policy concerns about open-ended liability for remote effects, which courts may cut off under a variety of labels (lack of duty, unforeseeability, intervening cause, scope of the risk)." Id. at \*6 (citation omitted). We have also explained proximate cause as requiring that a plaintiff "show that his or her injuries were within the reasonably foreseeable risks of harm created by the defendant's . . . conduct." Staelens v. Dobert, 318 F.3d 77, 79 (1st Cir. 2003) (applying Massachusetts law).

As is clear from the expert reports, Vicky clearly suffered harms that will require substantial mental-health treatment. These harms, and Vicky's resulting need for mental-health treatment, were reasonably foreseeable at the time of Kearney's conduct. Cf. Evers, 2012 WL 413810, at \*11 (finding reasonably foreseeable that a parent of a minor victim will attend court proceedings and miss work, resulting in losses proximately caused by the defendant and compensable under § 2259).

-34-

The restitution statute was enacted against a body of Supreme Court case law explaining the type of harm caused by distribution and possession of child pornography, including psychological harm, as discussed above. These cases make clear that injury to the child depicted in the child pornography, including injury that will require mental-health treatment, is a readily foreseeable result of distribution and possession of child pornography.

In addition, Congress expressly included "medical services relating to physical, psychiatric, or psychological care" as compensable losses under § 2259. 18 U.S.C. § 2259(b)(3)(A). This express inclusion -- which is not found in all other restitution statutes for other crimes, see id. § 3663(b)(1); id. § 3663A(b)(1) -- indicates that Congress believed such damages were sufficiently foreseeable to warrant their enumeration in the statute. This enumeration bears emphasis because at the same time Congress enacted § 2259, it enacted another restitution statute that did not enumerate categories of losses, but rather stated that "the term 'full amount of the victims losses' means all losses suffered by the victim as a proximate result of the offense."[13]

---

[13] Congress has also varied the precise coverage of enumerated categories of losses for other restitution statutes. Two restitution statutes enacted in the same bill as § 2259 -- 18 U.S.C. § 2248 and § 2264, have categories of compensable losses nearly identical to those of § 2259, but also include "any costs incurred in obtaining a civil protection order." Id. §§ 2248(b)(3)(E); 2264(b)(3)(E). Section 2248 provides restitution

-35-

Violent Crime Control and Law Enforcement Act, § 250002, 108 Stat. at 2083 (codified at 18 U.S.C. § 2327(b)(3)) (restitution for telemarketing fraud crimes).

In addition, Congress provided restitution for "any offense under this chapter" in § 2259. Id. § 2259(a) (emphasis added). Congress neither limited restitution to the initial creation of child pornography nor excluded cases of child pornography possession and distribution from those offenses which require mandatory restitution. This expression of congressional intent also weighs against any construction of a proximate cause requirement that would functionally preclude any award of restitution under § 2259 for possession and distribution offenses.

The policy concerns we noted in Davis would not lead us to find an absence of proximate cause here. There was no lack of duty on the part of the defendant, these losses were foreseeable, and the defendant took the risk of causing harm to the victim. See

---

for sexual abuse offenses, and § 2264 provides restitution for domestic violence and stalking offenses.

Similarly, 18 U.S.C. § 1593, which provides restitution for peonage, slavery, and human trafficking offenses, expressly incorporates the definition of "full amount of the victim's losses" used in § 2259, but includes "in addition . . . the greater of the gross income or value to the defendant of the victim's services or labor or the value of the victim's labor as guaranteed under the minimum wage and overtime guarantees of the Fair Labor Standards Act." Id. § 1593(b)(3).

These variances in compensable categories of losses for particular crimes, even though all these statutes contained a catch-all clause, demonstrate that Congress viewed particular offenses as causing foreseeable risks of certain losses, which Congress enumerated in the statutes.

<u>Davis</u>, 2012 WL 170871, at *6.  Nor would the concept of intervening cause be a bar.

Kearney's argument is in actuality an unsuccessful attempt to use a but-for causation standard to limit those reasonably foreseeable losses.  It is easy to reject the argument that but-for the biological father's crimes, there would have been no child pornography to possess and distribute; the biological father's previous acts do not eliminate the causation of harm flowing from Kearney's conduct.  Kearney also argues that because so many have seen and distributed the pornography, his contribution cannot be said to have caused any harm absent specific linkage to Vicky's knowledge about him.  We first deal with the argument in terms of a legal principle.

While the expert report explains in detail the harm Vicky has suffered from possession and distribution of the child pornography depicting her, it is true that it does not state that any single additional instance of possession or distribution by itself increases the harm to Vicky.  But although such an explanation would be sufficient for a finding of causation, it is not necessary for such a finding.  Kearney's conduct contributed to a state of affairs in which Vicky's emotional harm was worse than would have otherwise been the case.  Proximate cause exists where the tortious conduct of multiple actors has combined to bring about

harm, even if the harm suffered by the plaintiff might be the same if one of the numerous tortfeasors had not committed the tort.

This principle is widely accepted. As Prosser and Keaton explain in the context of but-for causation:

> When the conduct of two or more actors is so related to an event that their combined conduct, viewed as a whole, is a but-for cause of the event, and application of the but-for rule to each of them individually would absolve all of them, the conduct of each is a cause in fact of the event.

Keeton et al., Prosser and Keeton on Torts § 41 at 268 (5th ed. 1984). Results reached in reported decisions are "almost uniformly consistent" with this principle. Id. at 268 n.40.

To the extent that Kearney's argument is one of proximate causation, rather than but-for causation, the same reasoning applies to reject his contention. It is clear that, taken as a whole, the viewers and distributors of the child pornography depicting Vicky caused the losses she has suffered, as outlined in the expert report. Proximate cause therefore exists on the aggregate level, and there is no reason to find it lacking on the individual level. The Restatement (Third) of Torts has recognized this: causation exists even where "none of the alternative causes is sufficient by itself, but together they are sufficient" to cause the harm. Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 27 reporters' n. cmt. g. (2010); id. § 36 cmt. a ("[E]ven an insufficient condition . . . can be a factual cause of

harm when it combines with other acts to constitute a sufficient set to cause the harm . . . .").[14]

Kearney argues that because his contribution to the harm cannot be precisely ascertained with exactitude, and Vicky would have suffered harm in the absence of his conduct, he cannot be deemed to have proximately caused Vicky any harm. The "logic" of his argument is that there would be no remedy for the harm suffered by Vicky as a result of the redistribution and possession of her images. The law rejects such skewed "logic." See Keeton et al., Prosser and Keeton on Torts § 41 at 268-69 (5th ed. 1984) (advocating the rule discussed above because "[e]ach [defendant] seeks to escape liability for a reason that, if recognized, would likewise protect each other defendant in the group, thus leaving the plaintiff without a remedy in the face of the fact that had

---

[14] As an example of this principle, the Restatement's reporters discuss a case where a liquor store was not found liable under a dramshop statute, because the two "sips" of wine it provided to the intoxicated driver did not substantially contribute to the intoxication of the driver, who had a blood alcohol level of .12. Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 27 reporters' n. cmt. i. (2010). In discussing the "difficulty with dismissing such small potential causes," the reporters remark that "what if the driver had obtained wine from two dozen different sources and drank two gulps from each source, resulting in his intoxication? The conclusion that none of the sources was a cause of his intoxication is obviously untenable." Id.; see also Wright, Causation in Tort Law, 73 Cal. L. Rev. 1735, 1792 (1985) ("[I]n the pollution cases, the courts have allowed the plaintiff to recover from each defendant who contributed to the pollution that caused the injury, even though none of the defendants' individual contributions was either necessary or sufficient by itself for the occurrence of the injury.").

none of them acted improperly the plaintiff would not have suffered the harm" (footnote omitted)).

This result Kearney seeks would not only be illogical, but would also be contrary to the purposes of restitution under § 2259 with respect to child pornography distribution and possession. Kearney's interpretation would not only frustrate Congress's goal of ensuring that victims receive full compensation for the losses they have incurred under § 2259 but would be contrary to that goal. See United States v. Aguirre, No. 10-10175, 2011 WL 3629236, at *3 (9th Cir. Aug. 18, 2011) (per curiam) (Callahan, J., specially concurring). Congress made clear that restitution is "mandatory" "for any offense under" Chapter 110, which includes the provisions of 18 U.S.C. § 2252, criminalizing distribution and possession of child pornography. 18 U.S.C. § 2259(a), (b)(4)(A). We reject the theory that the victim of child pornography could only show causation if she focused on a specific defendant's viewing and redistribution of her images and then attributed specific losses to that defendant's actions. The facts here establish that when Vicky confronted particular defendants by reading a victim-impact statement at sentencing, her treatment was set back and she suffered retraumatization. The facts also show that when particular viewers/redistributors attempted to contact her, she suffered setbacks. There is no reason to think the proven paradigm of additional harm to her from

paying intensive attention to a particular offender would be different for this defendant.  Congress was attempting to compensate the victims of child pornography, not to intensify the harm they have already suffered as a condition of obtaining restitution.  Interpretation and application of the concept of proximate cause must be consistent with the congressional purpose of § 2259 of ensuring full compensation of losses for the victims of child pornography distribution and possession.[15]  This is a timeless principle of statutory interpretation.  See Dolan v. United States, 130 S. Ct. 2533, 2539 (2010) (interpreting the 90-day requirement of 18 U.S.C. § 3664(d)(5) in light of the fact that "the statute seeks primarily to assure that victims of a crime receive full restitution").

We hold that the proximate cause requirement was satisfied here, because Kearney's actions resulted in identifiable losses as outlined in the expert reports and Vicky's victim impact statements.[16]  Accord Monzel, 641 F.3d at 539.  We do not suggest

---

[15]  Indeed, Congress in § 2259 said that restitution may not be denied based on "the economic circumstances of the defendant," 18 U.S.C. § 2259(b)(4)(B)(i), or because the victim has received compensation from a collateral source, id. § 2259(b)(4)(B)(ii).

[16]  This result is consistent with United States v. Vaknin, 112 F.3d 579 (1st Cir. 1997), for several reasons.  First, Vaknin addressed causation under a different restitution statute, the VWPA, 18 U.S.C. §§ 3663, 3664, which contains different language, including with respect to enumerated categories of losses, and addresses different offenses than § 2259.  Indeed, restitution under § 3363(a) is not mandatory.  See id. § 3663(a)(1)(A).
    Second, Vaknin addressed a different question of proximate

that in all instances where there is a victim within the meaning of the statute, the victim is entitled to restitution, even if the victim lacks any knowledge of the defendant's crime. Here, Vicky's lawyer received a victim notification letter, and she affirmatively requested restitution. This is stronger evidence of notice than in some other cases.

### 4.    Determination of the Dollar Amount

Kearney's final argument is that the district court's method of determining the dollar amount of restitution was improper. This is a re-casting of his proximate cause argument discussed above: Kearney claims that because he was only one of numerous individuals who contributed to the losses incurred by Vicky, and the expert report and victim impact statements did not indicate what portion of those losses was caused by Kearney, the district court lacked a reasonable basis for determining that he was responsible for $3,800 of Vicky's losses. This final argument also fails.

---

cause. There, the court was concerned with whether "an intervening phenomenon . . . is the more immediate cause of the loss," -- essentially, whether the causal chain was too attenuated to satisfy the standard of proximate cause. Vaknin, 112 F.3d at 586; see also id. at 589 ("Restitution should not lie if the conduct underlying the offense of conviction is too far removed, either factually or temporally, from the loss."). This issue of proximate causation is conceptually distinct from the question of how to assess causation where a large number of individuals each contributed in some degree to an overall harm.

Third, to the extent that the causation standard announced in Vaknin could be thought to apply to § 2259, both but-for and proximate causation are established here.

The district court used the government's suggested figure, which was arrived at by averaging the awards Vicky had received in thirty-three other restitution cases, after discarding the highest and lowest values awarded. It considered this sum against the total losses. The court then found that this number was "proportionate and reasonable and tied to the facts of this case," and that the $3,800 was about 1.5% of the total amount that Vicky requested in restitution.

In calculating the dollar figure owed in restitution, the court need only make a "reasonable determination of appropriate restitution." United States v. Innarelli, 524 F.3d 286, 294 (1st Cir. 2008) (quoting United States v. Vaknin, 112 F.3d 579, 587 (1st Cir. 1997)) (internal quotation marks omitted). "Absolute precision" is not required. Id. (quoting United States v. Burdi, 414 F.3d 216, 221 (1st Cir. 2005)) (internal quotation marks omitted). Moreover, the district court has leeway to "resolve uncertainties 'with a view towards achieving fairness to the victim.'" Id. (quoting Vaknin, 112 F.3d at 587). Other circuits also recognize that "some degree of approximation" is acceptable under § 2259, and that "mathematical precision" is not required. Monzel, 641 F.3d at 540 (quoting United States v. Doe, 488 F.3d 1154, 1160 (9th Cir. 2007)) (internal quotation marks omitted).

Under this standard, the district court did not err. There is nothing improper about considering restitution awards in

other similar circumstances in fashioning a restitution award. Cf. Davis, 2012 WL 170871, at *9 (examining awards of damages in similar circumstances to determine whether an award of damages amounted to an abuse of discretion). The figures used were those of awards, not of actual collection of awards, which the record shows is far less, and the district court also found the award to be both proportionate and reasonable.

Here, the restitution award was small, both in absolute terms and as a proportion of the total amount of the restitution request. Kearney pled guilty not only to possession of child pornography depicting Vicky, but also to its distribution, thus ensuring a continuation of the harm to Vicky. Against the total amount of the loss, the total amount of restitution actually received by Vicky to the date of this award is still very far from approaching a sum of full compensation, and that sum may never, in fact, be reached.

Kearney does not contend that there is any danger of overcompensation present;[17] there is no indication that Vicky has come close to receiving the total amount of restitution requested. Any concerns about possible multiple compensations of the victim beyond actual losses, or of earlier restitution awards awarding too

---

[17] No issues of possible overcompensation of the victim, of joint and several liability, or of the operation of the collateral source rule in the statute were raised by Kearney.

much in light of subsequent restitution received, can be addressed if and when they arise in other cases.

We affirm the restitution award.

III.

The judgment of the district court is affirmed.